# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2005-CA-01280-SCT

*GLEN DANCY*

*v.*

*EAST MISSISSIPPI STATE HOSPITAL AND THE*
*MISSISSIPPI DEPARTMENT OF MENTAL*
*HEALTH*

| | |
|---|---|
| DATE OF JUDGMENT: | 06/01/2005 |
| TRIAL JUDGE: | HON. LARRY EUGENE ROBERTS |
| COURT FROM WHICH APPEALED: | LAUDERDALE COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | ROY GREGG ROGERS |
| | CHRISTOPHER MICHAEL FALGOUT |
| ATTORNEY FOR APPELLEES: | EUGENE M. HARLOW |
| NATURE OF THE CASE: | CIVIL - PERSONAL INJURY |
| DISPOSITION: | ON DIRECT APPEAL: AFFIRMED.  ON CROSS-APPEAL: DISMISSED AS MOOT - 12/07/2006 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE SMITH, C.J., DIAZ AND RANDOLPH, JJ.**

**RANDOLPH, JUSTICE, FOR THE COURT:**

¶1.     A patient taking part in the Clearing House Unit ("CHU") Day Program at East Mississippi State Hospital ("EMSH") was injured after escaping supervision on a field trip to Wal-Mart and attempting to commit suicide by running into traffic on Highway 19.  The Circuit Court of Lauderdale County found EMSH and its employees immune from liability under the discretionary function exemption of the Mississippi Tort Claims Act, *see* Miss. Code Ann. Section 11-46-9(1)(d).  From that ruling comes this appeal and cross-appeal.

**FACTS**

¶2.     On January 7, 1994, Glen Dancy ("Dancy") was committed to EMSH by order of the Chancery Court of Noxubee County.  This was the fourth time Dancy had been committed to EMSH.[1]   Between his commitment and the incident, Augustus signed five separate "Permission for Participation in Activities" slips.[2]   Prior to the incident, Dancy's last attempted escape from EMSH occurred on January 3, 2001.

¶3.     According to the Mississippi Department of Health ("MDMH"):

> it is the goal of mental health to place the patient in the least restrictive environment that their condition will allow.  And that has been scientifically proven to be the most effective way to treat a mentally ill patient.  And in fulfilling that goal they have a program at [EMSH] that is called the Clearing House Unit ["CHU"].

The notes of Dancy's "treatment team"[3] indicate that "[Dancy] voiced a desire to participate in the [CHU] [D]ay program."  According to Veliscia City-Jones ("City-Jones"), an institutional social worker at EMSH, the difference between CHU clients and CHU Day Program clients is that Day Program clients:

---

[1] According to Dancy's mother, Georgia Augustus, Dancy was first committed to EMSH in 1989 after intentionally overdosing on pills, suffering from alcohol problems, and hallucinating frequently.

[2] The permission slips were signed on September 6, 1997, September 21, 1998, May 5, 1999, September 23, 1999, and August 7, 2001.  They provided for "permission to participate in activities supervised by hospital staff on and off the grounds of [EMSH] while [Dancy] is a resident of Continuing Care Unit."  The permission slips also provided that, "participation in such activities is dependent upon approval of the treatment team and attending physicians."

[3] The "treatment team" consisted of a social worker, a psychologist, a nurse, a recreation worker, and a psychiatrist.

come over, and they attend groups, and they attend activities with the clients at [CHU] for us to monitor and let their treatment team know how we see that they're doing; if they're capable of transitioning from the unit they were on over to [CHU] as a full-time resident of [CHU], to then move to the next step to progress out of the hospital.[4]

The criteria for admission into the CHU Day Program is:

(1) Patients are to be referred by their Treatment Team of Continuing Care Services.
(2) Patients should have ground privileges for at least 2-3 months prior to their referral to the CHU Day Program.
(3) Patients should not be exhibiting any acute psychotic features or behavior disorders which could not be adequately managed in an open setting.

Dancy was admitted to the CHU Day Program.

¶4. Group therapy notes of March 20, 2002, indicate that Dancy successfully participated in a field trip. Treatment team notes from April 4, 2002, the day of the incident, reveal "[p]atient has increased control over his hallucinations ... not exhibiting inappropriate behavior such as stealing from others."

¶5. City-Jones arranged for the CHU to take a field trip to Wal-Mart.[5] Clearance to plan and implement the field trip came from a discussion of the treatment team. Dancy expressed a desire to participate in the field trip. According to City-Jones "if ... [patients] want to go and [there is] room, [the CHU] ha[s] the green light to take them without consulting any of their interdisciplinary team." Since Dancy had been admitted to the CHU Day Program, a

---

[4]The stated purpose of the CHU is "[t]o provide each patient treatment in areas that will help them grow into a more stable and responsible person. It is our belief that we should support each of our patients by providing a continuing process of rehabilitation in the *least restrictive environment*." (Emphasis added).

[5]Claire Sims, Director of Activity and Recreation Services at EMSH, stated a primary purpose of field trips is "to normalize the patients and get them into the community."

decision within the discretion of the treatment team, she felt "that he was to participate in our programming."

¶6.    On field trips, a written policy and procedure requirement mandates a patient:staff ratio of 5:1. On this trip there were twelve patients and three staff members, thus a ratio of 4:1.

¶7.    Separate written permission slips for each field trip were not required by EMSH. Sims testified "it has just always been understood," that they would be obtained on an annual basis. City-Jones stated if there was not an updated permission slip, "[t]hat person would have been removed from the trip." According to Dr. Ramiro Martinez, the chief executive officer of EMSH, the permission slip is "not really necessary if the treatment team fel[t] like the individual is progressing to that point." Although Dancy's mother had signed permission slips in the past, she now claims she "informed the hospital that I did not want him removed for any reason. I was not informed of the trip to Walmart ... ." She asserts that "his mind wasn't good at that time." She now claims to have understood that EMSH needed her permission to take Dancy on each specific field trip, in spite of the fact that she signed only one permission slip annually. Two or three days after the incident, Augustus received another "Permission for Participation in Activities" slip, which she did not sign.

¶8.    Regarding patient observation on field trips, Dr. Martinez stated there were no formal policies or procedures. EMSH employees explained that on field trips the staff members are "supposed to be where they can observe." Recreation assistant Debbie Eggleston stated "[e]ach staff member that attended Wal-Mart had a certain group of [patients]" to watch.

However, such observation did not preclude situations where patients may walk out of sight of the supervising staff member.

¶9.   The use of physical force by staff members was also not a matter of formal policy. In most situations, City-Jones stated that "the normal procedure ... would be to contact [the] security office at [EMSH]. And then they would make the determination of what steps they take." Prior to the arrival of security, physical force would be appropriate "where a client is a danger to self or a danger to others." According to Sims, "common sense" and experience were the mandated protocol in such situations. Dr. Martinez provided that a patient may be physically restrained if such restraint is possible and "the patient is becoming ... markedly disturbed and [it is] for his safety."

¶10.   Each staff member on the field trip had experience regarding off-grounds trips. The trip to Wal-Mart was aptly described by the circuit court as follows:

> [w]hile at Wal-Mart, [Dancy] was allowed to browse. After a short while, [Dancy] approached [City-Jones] with a Wal-Mart shopping bag, which contained a Walkman radio. [City-Jones] asked [Dancy] if he had a receipt and [Dancy] responded that he had lost the receipt. [City-Jones] escorted [Dancy] to the electronics department and [City-Jones] asked the clerk if [Dancy] had purchased the Walkman. The Wal-Mart clerk responded no. Then, [City-Jones] escorted [Dancy] to the front of the store to ask the check out clerks if [Dancy] had purchased the radio. At that point, [Dancy] tried to leave the store with the Wal-Mart shopping bag containing the radio and the alarm system activated. [Dancy] then came back into the store and went in the opposite direction from [City-Jones].

Then [City-Jones] called the CHU to advise them of the situation.[6] [City-Jones] stayed at the front of the store in an attempt to ensure that [Dancy] did not leave the store. At some point, Debbie Eggleston, another EMSH employee, came to the front of the store and [City-Jones] informed her of the situation. A few minutes afterward, [Dancy] came back to the front of the store, without the shopping bag, and had the Walkman radio out of its box, attached to his body with the headphones on. [Dancy] made another attempt to leave [the] store and Ms. Eggleston got his attention. At that point, one of the Wal-Mart customer service managers tried to talk to [Dancy]. Ms. Eggleston and the customer service manager convinced [Dancy] to relinquish the Walkman. As a result, [Dancy] became agitated and his behavior began to escalate.[7] [City-Jones] and Ms. Eggleston attempted to talk to [Dancy]. However, [Dancy] walked out of the Wal-Mart store exit. [City-Jones] followed [Dancy] out of the store and called for him to return. Despite her efforts, [Dancy] continued to walk through the Wal-Mart parking lot. [City-Jones] continued in her efforts to call after [Dancy], while watching him leave the parking lot, cross over Highway 19 and proceed up the [h]ighway until he was out of her sight.

[City-Jones] called the [CHU] back to inform them that [Dancy] had left the Wal-Mart parking lot.[8] Thereafter, [Dancy] jumped in front of a vehicle [on] Highway 19 ... .

Dancy later claimed that he was trying to kill himself "[b]ecause [he] wanted a radio." As a result of his injuries, Dancy alleges that he cannot run or jump. He has since been readmitted to EMSH and is currently a patient there.

---

[6]Specifically, City-Jones called CHU nurse Pamela Watkins and told her "we need somebody to come get [Dancy], because he is trying to take this Walkman." This was in accordance with applicable policy and procedure mandating the notification of a CHU nurse in escape situations. The nurse then calls security, which Watkins informed City-Jones she would do. The Wal-Mart was approximately a three-to-four minute drive from EMSH.

[7]According to City-Jones, "[Dancy] was standing there demanding that they give [the Walkman] back to him, it was his, he had bought it, he wanted it back ... ."

[8]This occurred five to ten minutes after her initial call. She told nurse Watkins that Dancy "had left the actual physical parking lot, and that we needed somebody to get him. Told her which way he was going on [Highway] 19." City-Jones stated that she did not see Dancy's escape as a threat to his health "until he got to where he was going to go out into the highway."

¶11.    Dancy filed a complaint against EMSH alleging that "[t]he actions of [EMSH] were negligent and in reckless disregard for the safety and well being of [Dancy]. The actions of [EMSH] proximately caused [Dancy's] injuries ... ." Additionally, the complaint asserted that Augustus "affirmatively informed [EMSH] that she did not want [Dancy] removed from the facility for any reason, due to his mental condition and subsequent behavior."

¶12.    MDMH pled, inter alia, that "[Dancy's] claims are barred by the provisions of the Mississippi Code Annotated Section 11-46-9 and in particular subsections (1)(b), (c), (d), (e), (f), (g), (h), (m), and (r)." MDMH filed a motion to dismiss and/or in the alternative motion for summary judgment in the circuit court. In support of its motion, MDMH argued that "the actions of EMSH were discretionary; therefore, MDMH is entitled to immunity pursuant to Miss. Code Ann. Section 11-46-9(1)(d)."

¶13.    In response to the motion for summary judgment, Dancy argued that the functions of the defendants were ministerial, not discretionary, and, therefore, they were not entitled to immunity. Dancy also asserted if one assumed the functions were discretionary:

> it is clear and convincing from the testimony of the employees of the Defendant that ordinary care was not used and that the employees of the Defendant showed reckless disregard for the safety of [Dancy] in the execution of the policies and procedures of the Defendant on this field trip.

¶14.    In its memorandum opinion and judgment, the circuit court concluded that:

> the actions of the employees in the handling of the patients and the implementation of the policy w[as] *discretionary*. ... [W]here the employee is required to rely upon his own judgment in the performance of a duty, that duty is discretionary. The employees had to use their own judgment in how the patients were allowed to roam around the store ... . [T]he Court is of the opinion that taking patients on field trips is discretionary and that the employees of EMSH are immune even if that discretion is abused. [*See* Miss. Code Ann. Section 11-46-9(1)(d)]. Therefore, *this Court is of the opinion that*

7

*the Motion for Summary Judgment is well taken and that the MDMH is immune from liability under Section 11-46-9[(1)](d)*, MCA. As such, the Court finds the *MDMH is entitled to a judgment as a matter of law*.

(Emphasis added).[9]

## ISSUES

¶15.    The following two issues were raised, the first on appeal and the second on cross-appeal:

> I. Whether the circuit court erred in dismissing all of Dancy's claims as barred by discretionary function immunity.
> II. Whether the circuit court erred in denying MDMH's motion to dismiss for improper and/or insufficient service of process.

This Court finds Issue I is dispositive, and therefore, addresses only that issue. This Court dismisses the cross-appeal as moot.

## STANDARD OF REVIEW

¶16.    This appeal involves whether a governmental entity is exempt from liability under the Mississippi Tort Claims Act. In ***Mitchell v. City of Greenville***, 846 So. 2d 1028 (Miss. 2003), this Court stated:

> [i]mmunity is a question of law and is a proper matter for summary judgment under Miss. R. Civ. P. 56.
> This Court reviews de novo a trial court's summary judgment. ***Short v. Columbus Rubber & Gasket Co.***, 535 So. 2d 61, 65 (Miss. 1988). All evidence is viewed in the light most favorable to the non-movant. ***Palmer v. Biloxi Reg'l Med. Ctr., Inc.***, 564 So. 2d 1346, 1354 (Miss. 1990).

***Mitchell***, 846 So. 2d at 1029-30. Therefore, we review de novo.

---

[9]The circuit court additionally concluded that "[n]one of the evidence before the Court indicates that EMSH employees acted with reckless disregard for the safety of the Plaintiff."

8

I.      **Whether the circuit court erred in dismissing all of Dancy's claims as barred by discretionary function immunity.**

¶17.    "The [Mississippi Tort Claims Act] waives sovereign immunity from claims for money damages arising out of the torts of governmental entities and their employees ... ." *L.W. v. McComb Separate Mun. Sch. Dist.*, 754 So. 2d 1136, 1138 (Miss. 1999). However, certain circumstances are exempt from this waiver of immunity. One such exemption provides:

> [a] governmental entity and its employees acting within the course and scope of their employment or duties shall *not* be liable for any claim: ... (d) [b]ased upon the exercise or performance or the failure to exercise or perform a *discretionary function or duty* on the part of a governmental entity or employee thereof, whether or not the discretion be abused ... .

Miss. Code Ann. Section 11-46-9(1)(d) (emphasis added).[10]  This Court has stated that:

> Section 11-46-9 appears to be patterned after 28 U.S.C. § 2680(a), the 'discretionary function' exception to the Federal Tort Claims Act. The United States Supreme Court has recognized that the majority of acts in the day-to-day operations of governmental activities involve the exercise of some form of discretion, however, not all of these acts are protected under the exception. In determining the scope of the acts protected under the exception, the Supreme Court held that only those functions which by nature are policy

---

[10]The Federal Tort Claims Act has a similar exemption which provides that the United States Government is not liable for:

> any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a).

decisions, whether made at the operational or planning level, are protected. *United States v. Gaubert*, 499 U.S. 315, 322, 113 L. Ed. 2d 335, 111 S.Ct. 1267 (1991). 'The purpose of the exception is to prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort.' *Id*. at 323 (quoting *United States v. Varig Airlines*, 467 U.S. 797, 814, 104 S.Ct. 2755, 81 L. Ed. 2d 660 (1984)).

*Jones v. Miss. Dep't of Transp.*, 744 So. 2d 256, 260 (Miss. 1999).

¶18.   "In determining whether governmental conduct is discretionary the Court must answer two questions: (1) whether the activity involved an element of choice or judgment; and if so, (2) whether the choice or judgment in supervision involves social, economic or political policy alternatives." *Bridges v. Pearl River Valley Water Supply Dist.*, 793 So. 2d 584, 588 (Miss. 2001) (citing *Jones*, 744 So. 2d at 260).[11]

¶19.   Regarding question (1), this Court must determine whether the function "involved an element of choice or judgment," *id*., i.e. is the function discretionary or ministerial? This Court has stated that "[a] duty is discretionary if it requires the official to use her own judgment and discretion in the performance thereof." *T.M. v. Noblitt*, 650 So. 2d 1340, 1343 (Miss. 1995) (citing *Poyner v. Gilmore*, 171 Miss. 859, 158 So. 922, 923 (1935)).   By contrast, an act is ministerial "[if] the duty is one which has been positively imposed by law and its performance required at a time and in a manner or under conditions which are specifically designated, the duty to perform under the conditions specified not being

---

[11]The ordinary care standard is not a consideration under this test as "Miss. Code Ann. § 11-46-9(1)(d) exempts governmental entities from liability of a discretionary function or duty 'whether or not the discretion be abused.'" *Collins v. Tallahatchie County*, 876 So. 2d 284, 289 (Miss. 2004).

dependent upon the officer's judgment or discretion." *L.W.*, 754 So. 2d at 1141. *See also* *Collins*, 876 So. 2d at 289.

¶20.    The functions at issue in this case include: (I) admitting Dancy to the CHU Day Program; (ii) permitting Dancy to attend the field trip to Wal-Mart; (iii) observing Dancy in Wal-Mart; and (iv) permitting Dancy to leave Wal-Mart without attempting physical restraint.  Neither party alleges that any of these functions lacked "an element of choice or judgment." *See* *Bridges*, 793 So. 2d at 588.  Admission of Dancy to the CHU Day Program, which included permission to attend Day Program field trips, was within the discretion of the treatment team.  Patient observation on field trips was flexible and did not require staff members to constantly have patients in sight.  The use of physical restraint requires staff members to make assessment of the situation and then to exercise common sense in making a judgment call based upon their experience.  Therefore, this Court concludes that question (1) is answered in the affirmative, as the activities involved elements of choice or judgment.

¶21.    Therefore, we address question (2), "whether the choice or judgment in supervision involves social, economic or political policy alternatives." *Id*.  There are no economic or political policy alternatives at issue here, leaving only an analysis of the social policy alternative.  Thus, we are left with a singular inquiry: did the choice or judgment in supervision involve social policy?  Unquestionably, the choice and judgments required of these state workers emanate from, or relate to, matters of human welfare.  The CHU Day Program seeks to integrate these patients into society as a whole, requiring a multitude of discretionary decisions by staff members, as opposed to the ministerial functions of the

11

nurses aides in *Mississippi Department of Mental Health v. Hall*, 936 So. 2d 917 (Miss. 2006).[12]

¶22.    The policy underlying question (2) is that "[s]tate tort standards cannot adequately control those government decisions in which, to be effective, the decision maker must look to considerations of public policy and not merely to established professional standards or to standards of general reasonableness." *Womble v. Singing River Hosp.*, 618 So. 2d 1252, 1263 (Miss. 1993) (quoting *Pruett v. City of Rosedale*, 421 So. 2d 1046, 1051-52 (Miss. 1982)).  In making the discretionary function determination, this Court has adopted the

---

[12]This case is clearly distinguishable from this Court's recent decision in *Hall*.  There a patient in a locked unit at EMSH, who had been described in recent progress notes as a "danger to herself and others," 936 So. 2d at 923, was seriously injured after falling from a third-story window during an escape attempt. *See id*. at 921.  The injured patient, along with two other patients had taken sheets from a linen closet; freely entered an unlocked, off-limits conference room adjoining the nurse's station; removed a window pane (which lacked a security screen); and attempted to escape. *See id*. at 923-24.  During the escape, most of the nurse's aides were watching television. *See id*. at 924.  This Court stated:

> East Mississippi is required by statute to provide patients with mental health care and treatment in accord with contemporary professional standards. *Miss. Code Ann. § 41-21-102(6)* (Rev. 2005).  Adhering to the mandates of this statute is not discretionary, and, therefore, it is *ministerial*.  Dr. Hiatt testified that contemporary professional standards dictate that: (1) the doors to rooms where a patient might be present and unsupervised should be locked; (2) security screens should be placed on windows in rooms where a patient might be present and unsupervised; and (3) patients should be monitored in a way so that any out-of-the-ordinary actions on the part of the patients might be detected.

> We find that the duties East Mississippi owed to its patients were not discretionary and that the discretionary function immunity provisions of the Mississippi Tort Claims Act do not shield East Mississippi from liability ... .

936 So. 2d at 925 (emphasis added).

12

"public policy function test" announced by the United States Supreme Court in *United States v. Gaubert*, 499 U.S. at 322. *See Jones*, 744 So. 2d at 260. Applying that test, "this Court must distinguish between real policy decisions implicating governmental functions and simple acts of negligence which injure innocent citizens." *Gale v. Thomas*, 759 So. 2d 1150, 1162 (Miss. 1999). *See also Gaubert*, 499 U.S. at 323 (quoting *Berkovitz v. United States*, 486 U.S. 531, 537, 108 S.Ct. 1954, 1959, 100 L. Ed. 2d 531, 541 (1988)) ("when properly construed, the exception 'protects only governmental actions and decisions based on considerations of public policy.'").

¶23.    In *Gaubert*, the United States Supreme Court stated "[i]f the routine or frequent nature of a decision were sufficient to remove an otherwise discretionary act from the scope of the exception, then countless policy-based decisions by regulators exercising day-to-day supervisory authority would be actionable. This is not the rule of our cases." 499 U.S. at 334. Therefore, the mere fact that patient observation and physical restraint are routine or frequent decisions does not render them devoid of policy implications. Moreover, "[w]hen established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion, it must be presumed that the agent's acts are *grounded in policy when exercising that discretion*." *Id*. at 324 (emphasis added). Applied here, this standard involves two steps. First, Miss. Code Ann. Section 41-4-7(g) gives MDMH discretion "[t]o establish and promulgate reasonable minimum standards" and policies. Second, MDMH has "establish[ed] and promulgate[d]" standards which authorize discretion on the part of its agents. Patient observation and the physical restraint of patients provide two examples of such discretion in practice. Therefore, this Court

concludes that MDMH's overall policy of authorized discretion was implicated here. The choice or judgment involved in patient observation and the physical restraint of patients "involves social ... policy," **Bridges**, 793 So. 2d at 588, such that the governmental functions at issue were discretionary.

¶24.    Having reached this conclusion, the cross-appeal, Issue II, is moot.

## CONCLUSION

¶25.    Accordingly, this Court (1) affirms on direct appeal the circuit court's judgment that the governmental functions at issue were discretionary and, therefore, immune from liability under Miss. Code Ann. Section 11-46-9(1)(d) and (2) dismisses the cross-appeal as moot.

¶26.    **ON DIRECT APPEAL: AFFIRMED. ON CROSS-APPEAL: DISMISSED AS MOOT.**

**SMITH, C.J., WALLER AND COBB, P.JJ., DIAZ, EASLEY, CARLSON AND DICKINSON, JJ., CONCUR. GRAVES, J., CONCURS IN RESULT ONLY.**