974 So.2d 253 (2007)
MISSISSIPPI DEPARTMENT OF HUMAN SERVICES, Appellant
v.
S.W., Appellee.
No. 2005-CA-00227-COA.
Court of Appeals of Mississippi.
August 7, 2007.
Rehearing Denied November 27, 2007.
*255 James P. Streetman, David Lee Gladden, attorneys for appellant.
*256 Carlton W. Reeves, J. Douglas Minor, Jackson, attorneys for appellee.
Before CHANDLER, P.J., BARNES and CARLTON, JJ.
CARLTON, J., for the Court.
¶ 1. This is a negligence suit brought by a minor against the Mississippi Department of Human Services (DHS) alleging that DHS breached its statutory duties to him while he was in its care and custody, allowing him to be sexually abused by employees of the child care facilities in which he was placed. The trial judge, sitting without a jury, entered judgment against DHS in the amount of $750,000. DHS filed a motion for new trial, remittitur or, in the alternative, motion to amend judgment. The trial judge denied the motion. DHS appeals. We affirm as to liability and reverse and remand for a new trial on damages only.

FACTS
¶ 2. On October 4, 1996, fourteen-year-old S.W.[1] was placed in the care and custody of DHS after substantiated reports that his mother, T.W., beat him with an extension cord. Later that month, DHS placed S.W. in the Region VII Chemical Dependency Unit (CDU) in Ackerman, Mississippi. Upon his arrival at CDU, S.W. met Larenzo Williams, a "youth care specialist" employed by CDU to assist the residents of the facility. S.W. alleged that shortly after his arrival at CDU, Williams engaged in sexual acts with him. Specifically, S.W. stated that he awoke to Williams inappropriately touching him under the covers. S.W. testified that this conduct went on twice a week for the entire time he was in CDU and that he never reported these instances of abuse because he feared reprisal from Williams in the form of punishment or a decrease in privileges and activities.
¶ 3. S.W. was later transferred by DHS to the Special Needs in State Placement (SNIPS) facility in Starkville, Mississippi, where he remained until he returned to the physical custody of T.W. on June 6, 1997. Shortly after S.W.'s transfer to the SNIPS facility, Williams was also transferred to the SNIPS facility. S.W. alleged that, upon his placement at SNIPS, Williams continued to engage in sexual acts with him such as, rubbing, touching and performing oral sex on him. S.W. stated that Williams would sometimes leave letters for him containing as much as sixty dollars. S.W. further stated that Rick Howard, another employee of SNIPS, regularly engaged in sexual acts with him including anal sex, which S.W. performed on Howard. S.W. testified that the sexual activity occurred frequently  up to two or three times a week, S.W. stated that things got "out of control" at SNIPS because Williams had more power over him. Williams had authority to impose various punishments on S.W. such as early bedtime, time-out and confinement to his room. Williams also had authority to take away various recreational activities such as watching television, playing with the other children, listening to the radio and using the telephone. S.W. testified that when he would resist Williams' sexual advances, he would sometimes lose his privileges or be bumped to a lower level of progression which made it more difficult for him to achieve the level which would allow him to return home.
¶ 4. On June 6, 1997, S.W. was released from SNIPS and returned to his mother's home; however, S.W. remained in DHS custody until December 1997. Williams *257 sent numerous romantic cards and letters to S.W. at his mother's home. The cards and letters expressed Williams' love for S.W., his desire to have a "continuing relationship," and his frustration with S.W.'s failure to reciprocate.[2] Williams also mailed pre-paid phone cards to S.W. to enable S.W. to call him inconspicuously. Despite S.W.'s effort to hide these items, T.W. eventually found them and contacted DHS to express her concern. Shortly thereafter a meeting was held with S.W., his mother, his grandmother, DHS social worker, Elsie Roarke, DHS regional director, Billie Sims, and DHS supervisor, Beth Leggett. In the presence of this group, S.W. was asked if he had been sexually abused by workers at SNIPS or CDU; he replied that he had not. DHS summarily determined that S.W. had not been abused. This meeting was the extent of DHS's investigation.
¶ 5. S.W. later brought a negligence action against DHS under the Mississippi Tort Claims Act (MTCA). The complaint sought compensatory and punitive damages as well as damages for mental and emotional distress. S.W. alleged that DHS neglected to carry out its duties to him while he was in their custody, which allowed him to be sexually abused. He alleged further that DHS failed to fully investigate the reported abuse and failed to ensure that he received medical treatment in the form of psychological counseling.
¶ 6. At trial, both Williams and Howard denied the allegations of sexual abuse. Williams testified that although he never engaged in any sexual activities with S.W., it probably would have happened because he had feelings for S.W. Williams admitted that he liked S.W. in the wrong way, as in love for another man. He stated that he had a desire for S.W. and had dreams of being with him. Williams' cards and letters were also introduced at trial.
¶ 7. The trial court found that DHS breached its duty to protect and care for S.W. in three respects: (1) that DHS failed to make required monthly face-to-face contacts with S.W., (2) that DHS failed to sufficiently investigate the report of sexual abuse, and (3) that DHS failed to provide much needed counseling upon S.W.'s return home. The trial court determined that DHS's negligent conduct subjected S.W. to sexual abuse thereby causing him damages. Accordingly, judgment was entered in favor for S.W. awarding $750,000 in damages.

STANDARD OF REVIEW
¶ 8. Claims brought under the MTCA are tried before the appropriate court without a jury. Miss.Code Ann. § 11-46-13(1) (Rev.2002). The standard of review for a judgment entered following a bench trial is well settled. We review questions of law de novo. Miss. Dep't of Mental Health v. Hall, 936 So.2d 917, 922(6) (Miss.2006). The proper application of the MTCA is a question of law. City of Newton v. Lofton, 840 So.2d 833, 836(¶ 7) (Miss.Ct.App.2003). A trial judge is accorded the same deference regarding his *258 findings as is a chancellor and his findings will not be disturbed where they are support by substantial, credible and reasonable evidence. Jones v. Mississippi Transp. Comm'n, 920 So.2d 516, 518(¶ 11) (Miss.2003). We will only disturb the trial judge's findings if the trial judge abused his discretion, was manifestly wrong, clearly erroneous or applied an erroneous legal standard. Id. As the trier of fact, the trial judge "[Was the sole authority for determining the credibility of the witness." Thompson ex rel. Thompson v. Lee County Sch. Dist., 925 So.2d 57, 62(7) (Miss. 2006) (citations omitted).

DISCUSSION
I. WHETHER DHS WAS IMMUNE FROM LIABILITY UNDER THE MISSISSIPPI TORT CLAIMS ACT.
¶ 9. Under this assignment of error, DHS argues that the alleged negligent conduct was discretionary in nature and, therefore, immune from suit under Mississippi Code Annotated Section 11-46-9(1)(d). S.W. argues that the challenged conduct was ministerial in nature and not subject to the discretionary function exception.
¶ 10. The MTCA authorizes suits against the State and its political subdivisions for damages "[a]rising out of the torts of such governmental entities and the torts of their employees while acting within the scope of their employment. . . ." Miss.Code Ann. § 11-46-5(1). However, the act provides certain enumerated exceptions to this waiver of immunity. The exception relevant to this assignment of error provides that the State and its employees are not liable for any claim "[b]ased upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a governmental entity or employee thereof, whether or not the discretion be abused[.]" Miss.Code Ann. § 11-46-9(1)(d).
¶ 11. "In determining whether governmental conduct is discretionary the Court must answer two questions: (1) whether the activity involved an element of choice or judgment; and if so, (2) whether the choice or judgment in supervision involves social, economic or political policy alternatives." Bridges v. Pearl River Valley Water Supply Dist., 793 So.2d 584, 588(15) (Miss.2001) (citing Jones v. Miss. Dep't of Transp., 744 So.2d 256, 260(10) (Miss.1999)). A duty is discretionary if the government actor is required to exercise his or her judgment or discretion in performing the duty. Dancy v. East Miss. State Hosp., 944 So.2d 10, 17-18(19) (Miss. 2006) (citing T.M. v. Noblitt, 650 So.2d 1340, 1343 (Miss.1995)). On the other hand, "[a] duty is ministerial and not discretionary if it is imposed by law and its performance is not dependent on the employee's judgment." Mississippi Dep't of Transp. v. Cargile, 847 So.2d 258, 267(¶ 35) (Miss.2003) (citing Mohundro v. Alcorn County, 675 So.2d 848, 853 (Miss.1996)). The United States Supreme Court has explained that "[t]he requirement of judgment or choice is not satisfied if a `federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow,' because the employee has no rightful option but to adhere to the directive.'" United, States v. Gaubert, 499 U.S. 315, 322, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991) (quoting Berkovitz v. United States, 486 U.S. 531, 536, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988)). Our inquiry thus turns on whether the challenged governmental conduct required the DHS actors to exercise their own policy-based judgment, or whether the actors were instead bound to perform their duties in accordance *259 with mandatory directives imposed by law. We now examine DHS's duties.
¶ 12. DHS is required by statute "Rio administer or supervise all public children welfare services[,]" and to "[p]rovide for the care of dependant and neglected children in foster family homes or in institutions. . . ." Miss.Code Ann. § 43-15-5 (Rev.2004). To carry out these duties, DHS has developed formal guidelines and procedures for the provision of social services in the areas of personal protection, prevention of abuse and neglect, and placement of children in out-of-home settings. This operating procedure is outlined in detail in the DHS's policy manual.
¶ 13. As previously stated, the trial court found that DHS breached its duty to protect and care for S.W. by failing to comply with its own regulations and procedures in three respects: (1) monitoring S.W. by monthly face-to-face contact, (2) investigating allegations of sexual abuse, and (3) providing medical care to S.W. in the form of counseling. We now examine the manual's directives as to each challenged governmental function in turn.
A. Contact With Foster Child
¶ 14. The manual generally requires weekly contact with a foster child during the first month of placement, and continuous "monthly face to face" visits with the child. DHS Administrative Manual Vol. IV, Section C, pages 3140, 3142 (emphasis added). A different provision of the manual specifically pertaining to a child placed in a licensed child care facility requires "[m]onthly contact with the child (weekly contact the first month of placement). Contacts may be made face-to-face, by telephone calls, or written correspondence. (Face-to-face contact must be at least quarterly)." Administrative Manual Vol. IV, Section C, page 3020 (emphasis added).[3]
¶ 15. Although the manner in which to execute the monthly contacts involves an element of choice, DHS employees are not at liberty to choose whether or not to adhere to the minimum contact requirements. At bottom, the manual requires (1) weekly contact during the first month of placement and monthly contact thereafter, whether face-to-face, by telephone calls, or written correspondence. and (2) quarterly face-to-face contact. DHS employees have no discretion to make less than the required contact. We find that DHS's duty to contact S.W. in accordance with the minimum mandatory directives of DHS regulations is ministerial in nature and the discretionary function exemption does not bar a cause of action for S.W.'s complaint of insufficient contact.
B. Investigation of Reported Abuse
¶ 16. The manual sets forth the procedure by which investigations of reported abuse are to take place. Generally, the social worker is required first to investigate the report and subsequently to decide whether the report is substantiated based on the results of the investigation. As to the investigation, the manual requires, among other things, that (1) "children should be interviewed privately, separately, and in a non-threatening place," (2) "an unannounced visit is required" to the residential facility for interview with the administrator, (3) DHS review the facility's policy and procedures, and (4) the alleged perpetrator be interviewed. Administrative Manual Vol. IV, Section B, pages 2041-42.
¶ 17. DHS's duty to investigate involves both ministerial and discretionary functions. DHS workers are certainly called *260 upon to exercise their own policy-based judgment in deciding whether a report of abuse is substantiated. However, the decision whether to substantiate the report requires, as a precondition, that DHS conduct an investigation of the alleged abuse. See T.M. v. Noblitt, 650 So.2d 1340, 1345 (Miss.1995) ("While the duty to investigate was of a ministerial nature, the next step of deciding whether reasonable cause actually existed to report the incident was inarguably one which required personal discretion.").
¶ 18. We find that DHS has no discretion to prematurely terminate an investigation without fully performing the outlined duties; to do so violates specific mandatory directives. To this extent, the discretionary function exemption does not bar a claim against DHS for S.W.'s claim of insufficient investigation.
C. Provide Medical Care
¶ 19. The manual reveals that DHS has the responsibility to secure dental, medical and psychological services for the children in their custody. To this end, testimony of S.W.'s 30(b)(6) witness, Wanda B. Gillom, a DHS supervisor, revealed that if a child is in DHS custody, DHS is responsible for that child's needs  monetary, physical, medical, or otherwise. She stated that once the needs are identified, DHS is required to make referrals for the child to receive those services; specifically, if a child is in DHS custody and needs mental health treatment, DHS is responsible for getting the child to and from that visit when the parent is unwilling or unable to do so.
¶ 20. Again, we find that DHS's actions in performing its duty involve both ministerial and discretionary functions. DHS employees are required to call upon their own policy-based judgment to determine whether the child needs a particular service  in the instant case, mental health treatment. However, once the determination is made, DHS is ultimately required to ensure that the child receives the service. The duty to ensure that the child receives the needed service involves no policy-based judgment or discretion. As discussed below, DHS determined that S.W. needed counseling and made an appointment with Clayton Hodge but failed to ensure that he actually received the counseling for quite some time. We find that the discretionary function exemption does not bar S.W.'s claim for DHS's failure to ensure that his medical needs were being met.
¶ 21. We find that the challenged governmental functions were mandatory in nature and the discretionary function exemption does not shield DHS from suit in this case. This issue is without merit.
II. WHETHER THE TRIAL JUDGE ERRED IN FINDING THAT DHS BREACHED ANY DUTIES IT OWED TO S.W.
¶ 22. To prevail on a claim of negligence, the plaintiff has the burden of proving (1) duty, (2) breach of duty, (3) causation, and (4) damages, by a preponderance of the evidence. Hall, 936 So.2d at 922(7) (citing Miss. Dep't of Transp. v. Cargile, 847 So.2d 258, 262(11) (Miss. 2003)).
¶ 23. DHS makes a compelling argument that monthly face-to-face contact is not required for children in their custody when these children are placed in a licensed child care facility such as CDU or SNIPS. They acknowledge that monthly face-to-face contacts are generally required; however, they point to the policy provision specifically pertaining to children placed in a licensed child care facility which requires only quarterly face-to-face visits. S.W. argues that DHS policy requires *261 monthly face-to-face contact. To support this contention, he relies largely on the testimony of DHS's 30(b)(6) witness, Wanda Gillom, who testified that DHS policy requires face-to-face contact on a monthly basis.
¶ 24. Because this issue involves interpretation of a governmental entity's standard operating procedure with no case law to guide us in our determination, we borrow basic principles of statutory construction which we find to be very useful.[4] To this end, we find that the general requirement of monthly face-to-face contact is irreconcilably inconsistent with the provision which requires quarterly face-to-face contact. The provision requiring only quarterly face-to-face contact pertains specifically to children placed in a licensed child care facility; therefore, it controls. Further, we find the actual language contained in the policy to control over the testimony of Ms. Gillom, who was herself interpreting DHS's duties as per DHS's policy.[5]
¶ 25. We find that DHS was under a duty to make quarterly face-to-face contact with S.W.  a child placed in a licensed child care facility. The court erred in finding that DHS was under a duty to make monthly face-to-face contact. However, this error was harmless because DHS failed to even make quarterly face-to-face contact with S.W.
¶ 26. S.W. was admitted to CDU on October 4, 1996, later transferred to SNIPS, and returned home on June 6, 1997. The record reflects that DHS made only two face-to-face contacts with S.W. during the nine months he resided in these facilities. One occurred on April 25, 1996  six months into. S.W.'s placement. The other occurred on June 6, 1997, when S.W. was driven from SNIPS to his mother's home by DHS social worker, Beth Leggett.[6] By making only two face-to-face contacts in nine months DHS breached its duty to care. Accordingly, we find that the trial judge did not err in so holding.
¶ 27. As to the investigation of abuse, DHS concedes that the duty to investigate was ministerial. However, they argue that DHS and its employees conducted the ministerial act of investigation into the reported abuse, and in their discretion, determined that the allegations were unsubstantiated. They contend that DHS is shielded from liability arising from their discretionary act of deciding that the allegations were unsubstantiated. T.M. v. Noblitt, 650 So.2d 1340, 1345-46 (Miss. 1995).
¶ 28. DHS's reliance on Noblitt is misplaced.[7] The court therein only determined *262 that both ministerial and discretionary conduct was involved in the performance of the duty; no determination was made as to whether the principal's actions or inactions breached the duty to investigate. Id. at 1345. Accordingly, the Noblitt court reversed the lower court's grant of the State's 12(b)(6) motion as further discovery was needed to develop the facts pertaining to the plaintiffs valid claim that the principle breached his duty to investigate. Id. What is clear from Noblitt is that the duty to investigate is ministerial and a government actor may be held liable for failure to sufficiently perform the duty.
¶ 29. Thus, we agree with DHS to the extent that DHS is immune from liability arising from their discretionary act of deciding that the allegations were unsubstantiated. However, as noted above, the decision whether to substantiate the report requires, as a precondition, that the DHS conduct investigation of the alleged abuse. See Id. at 1345 ("[T]he statute first requires [the government official] to make a determination of whether "reasonable cause" exists as a foundation for an incident report. To that end, some investigation or other action on the official's part must be undertaken."). The question then is whether DHS breached its ministerial duty to investigate the reported abuse.
¶ 30. We find that DHS's investigation was grossly inadequate. As discussed above, the DHS policy clearly proscribes the manner in which its employees are to conduct their investigation.[8] In derogation of DHS's policy to interview the child privately, separately and in a non-threatening place, S.W. was interviewed in a group of persons consisting of his mother, his grandmother, his social Worker, Elsie Roarke, DHS regional director, Billie Sims, and DHS supervisor, Beth Leggett. In front of this audience, including his own grandmother, S.W. was asked if he had engaged in homosexual activity. As could reasonably be expected, S.W. denied the allegations which, in that moment, seemed directed at him.[9] Additionally, the record contains no evidence that DHS complied with policy by (1) making an unannounced visit to the residential facility to conduct and interview with the administrator, (2) reviewing the facility's policy and procedures, or (3) interviewing the alleged perpetrators. We find the "investigation" conducted by DHS in the instant case was in violation of clear mandatory duties contained in its policy and amounted to a mere cursory glance into the reported abuse  clearly an insufficient basis upon *263 which to determine substantiation. The trial judge did not err in finding that. DHS breached its duty to sufficiently investigate the reported abuse.
¶ 31. DHS argues that they should not be held liable because they had no indication of a specific threat on Williams' or Howard's part to harm S.W. They contend that Williams and Howard were not DHS employees and DHS had no supervisory control over them. Doe v. State ex rel. Miss. Dep't of Corrections, 859 So.2d 350, 359(¶ 32) (Miss.2003) ("A person who does not have the ability to control another's conduct should not have liability imposed upon him or her for the tortious acts of that person." (citing Taggart v. State, 118 Wash.2d 195, 822 P.2d 243, 263-64 (1992))).
¶ 32. We find Doe easily distinguishable from the instant case. In Doe, the State owed no duty to protect the specific victim. The relationship between the State and the victim arose solely out of the assault by an attacker with whom the State had a relationship. However, in the instant case, DHS owed a duty to protect S.W.; therefore, the State's liability springs forth from a duty owed to protect the specific victim, not merely from the State's duty to supervise the attacker. By taking S.W. into its custody, DHS was charged with the duty to protect him. This duty is wholly distinct from a duty to supervise the attacker. See generally L.W. v. McComb Separate Mun. Sch. Dist., 754 So.2d 1136, 1143(29) (Miss.1999) (public schools have duty to provide a safe school environment for students).
III. WHETHER THE TRIAL JUDGE ERRED IN DENYING DHS'S MOTION FOR NEW TRIAL, MOTION FOR REMITTITUR, OR IN THE ALTERNATIVE, MOTION TO AMEND JUDGMENT TO CONFORM WITH THE APPLICABLE STATUTORY LIMITATIONS OF LIABILITY FOUND IN MISS. CODE ANN. SECTION 11-46-15.
¶ 33. DHS argues that S.W. failed to produce sufficient evidence to support the trial judge's award of $750,000. Specifically, DHS contends that S.W. did not put forth evidence to support the damage elements of physical injury, mental anguish or emotional distress, temporary or permanent disability, medical expenses, or loss of wages or wage earning capacity. DHS also claims that the award of $750,000 was in contradiction to the statutory limitations of Mississippi Code Annotated Section 11-46-15(1). It contends that Mississippi Code Annotated Section 11-46-15(3) mandates a reduction of the award to $50,000.[10] S.W. argues that each breach of duty constitutes a separate occurrence, for which he is entitled to recover damages up to the statutory cap for the applicable time period in which the breach occurred.
¶ 34. Mississippi Code Annotated Section 11-46-15(1) provides in relevant part:
(1) In any claim or suit for damages against a governmental entity or its employee brought under the provisions of this chapter, the liability shall not exceed *264 the following for all claims arising out of a single occurrence for all damages permitted under this chapter:
(a) For claims or causes of action arising from acts or omissions occurring on or after July 1, 1993, but before July 1, 1997, the sum of Fifty Thousand Dollars ($50,000.00).
(b) For claims or causes of action arising from acts or omissions occurring on or after July 1, 1997, but before July 1, 2001, the sum of Two Hundred Fifty Thousand Dollars ($250,000.00).
Miss.Code Ann. § 11-46-15(1)(a)(b).
¶ 35. The record of the proceedings below provides an insufficient basis for review of the issues presented under this assignment of error. The trial judge failed to disclose how he arrived at the $750,000 damage award. As noted above, the trial judge found that DHS breached three separate duties; however, there is no finding in the order as to what damage, if any, was attributed to each of the respective breaches. This information is crucial for this. Court to fully address the issues raised in this assignment of error because the separate breaches identified by the trial judge occurred during two separate periods of time, each carrying a different statutory limitation of liability under subsection (1)(a) and (b)  whether the award complies with the statutory caps of Section 11-46-15(1). In the absence of such findings, we are unable to determine which statutory cap is applicable to limit damages awarded for each respective breach. Therefore, from the trial judge's order, we are unable to arrive at a maximum monetary figure which S.W. is entitled to recover under Section 11-46-15(1). However, we find that under any calculation, the award of $750,000 is above the statutory limitation of Section 11-46-15(1). We, therefore, reverse and remand for a new trial on damages only.

CONCLUSION
¶ 36. We affirm the findings of the trial judge that DHS breached each of the three duties identified in the order. Therefore, we affirm the trial judge's finding as to liability. However we reverse and remand the case for a new trial on damages and instruct the trial judge to include in his or her order findings of fact which clearly identify what damage, if any, is attributed to each of the three breaches respectively. We further instruct the trial judge to assess damages for each breach in accordance with the applicable statutory limitation pursuant to Section 11-46-15(1) and to specify in his or her findings of fact under which provision damages are awarded. In the event an appeal is taken from the new trial on damages only, this will ensure that the reviewing court therein will be able to sufficiently address any issues pertaining to the limitations of liability under the MTCA.
¶ 37. THE JUDGMENT OF THE HINDS COUNTY CIRCUIT COURT IS AFFIRMED IN PART AND REVERSED AND REMANDED IN PART. ALL COSTS OF THIS APPEAL ARE ASSESSED EQUALLY TO THE APPELLANT AND APPELLEE.
KING, C.J., LEE AND MYERS, P.JJ., IRVING, CHANDLER, GRIFFIS, BARNES, ISHEE AND ROBERTS, JJ., CONCUR.
NOTES
[1] Although S.W. is now over the age of twenty-one, his name will not be used due to the nature of the sexual abuse allegations of his complaint while he was a minor.
[2] Excerpts from his correspondence revealed the following statements:

"I love you in so many ways and for so many reasons"
"There's no one else in the world who gives me love like you"
"So warm and kind you satisfy my desire, that's why I love you Pimp and your mine all mine!
"I'm sending you these calling cards . . . don't leave nothing "crazy" on the answering machine o.k. Just say something cool, because mama be listening."
"[I]'m missing out on a lot of you know what."
[3] The parties dispute whether monthly or quarterly face-to-face contact is required.
[4] Intent is first sought within the plain meaning of the relevant statute. City of Natchez v. Sullivan, 612 So.2d 1087, 1089 (Miss.1992). If ambiguity is found, we seek to resolve it by reading sections of the code pertaining to the same or similar subject matter as a whole. State ex rel. Hood v. Madison County, 873 So.2d 85, 90(19) (Miss.2004). If statutes are irreconcilably inconsistent, a specific statute controls over a general statute. Id. at (22).
[5] In their appellate brief, the attorneys for DHS point out by way of analogy that "the sworn testimony of every Mississippi State Trooper that the speed limit on Mississippi Interstates is fifty-five (55) miles per hour would not change the fact that the legal speed limit is seventy (70) miles per hour."
[6] Without elaboration we note the practical insignificance of the face-to-face contact on the day of S.W.'s departure from the facility.
[7] In Noblitt, the court addressed the issue of whether ministerial or discretionary duties were created by Miss.Code Ann. Section 43-21-353(1), which provides in part:

(1) Any . . . public school district employee or any other person having reasonable cause to suspect that a child is a neglected or abused child shall cause an oral report to be made immediately by telephone or otherwise, and followed as soon thereafter as possible by a report in writing to the Department of Human Services
Noblitt, 650 So.2d at 1344-45. The court concluded that the duty to report suspected abuse included elements of both ministerial and discretionary conduct reasoning as follows:
Assuming a public official such as Noblitt is involved, the statute first requires that person to make a determination of whether "reasonable cause" exists as a foundation for an incident report. To that end, some investigation or other action on the official's part must be undertaken. The actual determination of whether reasonable causes exists, however, is clearly a decision involving the exercise of personal judgment and discretion. . . .
Id.
[8] DHS employees are instructed to (1) interview children privately, separately, and in a non-threatening place, (2) make an unannounced visit to the residential facility to interview the facility's administrator, (3) review the facility's policy and procedures, and (4) interview the alleged perpetrator. Vol. IV, Section B, pages 2041-42.
[9] The circumstances surrounding this meeting greatly diminish the veracity of S.W.'s denial.
[10] Miss.Code Ann. Section 11-46-15(3) provides:

(3) Except as otherwise provided in Section 11-46-17(4), in any suit brought under the provisions of this chapter, if any verdict which is returned, when added to costs and attorney's fees authorized by law, would exceed the maximum dollar amount of liability provided in subsection (1) of this section, the court shall reduce the verdict accordingly and enter judgment in an amount not to exceed the maximum dollar amount of liability provided in subsection (1) of this section.