# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2021-SA-00784-COA

**ANDREW CORNELL F/K/A ANDREW FAULKNER**                                        **APPELLANT**

**v.**

**MISSISSIPPI DEPARTMENT OF HUMAN SERVICES**                                        **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 06/24/2021 |
| TRIAL JUDGE: | HON. CHRISTOPHER LOUIS SCHMIDT |
| COURT FROM WHICH APPEALED: | HANCOCK COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | EDWARD GIBSON |
| ATTORNEY FOR APPELLEE: | TRACE D. McRANEY |
| NATURE OF THE CASE: | CIVIL - PERSONAL INJURY |
| DISPOSITION: | AFFIRMED IN PART; REVERSED AND REMANDED IN PART - 01/03/2023 |
| MOTION FOR REHEARING FILED: | |

**BEFORE CARLTON, P.J., WESTBROOKS AND SMITH, JJ.**

**CARLTON, P.J., FOR THE COURT:**

¶1.     Andrew Cornell filed a negligence suit against the Mississippi Department of Human Services (MDHS) alleging that MDHS breached its duties to him while he was in its care and custody.  Andrew specifically claimed he was sexually abused for years by his foster father, Ricky Faulkner.  Andrew further alleged that Ricky was a known pedophile at the time of Andrew's placement with the Faulkners (i.e., MDHS failed to "screen" the foster home before the placement).

¶2.     MDHS moved for summary judgment.  After a hearing, the Hancock County Circuit Court granted summary judgment in favor of MDHS based on lack of causation and statutory

immunity from the alleged liability involving MDHS's "investigation and licensing of the Faulkner foster home."

¶3.     Andrew now appeals.  Upon review, we find that Andrew produced sufficient evidence to meet his burden of showing that a genuine issue of material fact existed with regard to certain negligence claims.  Specifically, we find that Andrew presented sufficient evidence that an MDHS employee's failure to report allegations of abuse was a cause in fact and legal cause of Andrew's continued sexual abuse, and MDHS's breach of its duty to conduct its required visits with Andrew was a proximate cause of Ricky's repeated sexual abuse of Andrew.  Accordingly, we reverse the circuit court's grant of summary judgment in part and remand for further proceedings on these matters.  As to Andrew's remaining claim involving MDHS's pre-placement licensing decisions, we affirm the circuit court's grant of summary judgment.

**FACTS**

¶4.     In 1998, Andrew was placed in the custody of MDHS and the Hancock County Department of Human Services.  In 2000, when Andrew was approximately five years old, he was placed in the home of foster parents David ("Ricky") and Melissa Faulkner.  During his time in foster care, Andrew's MDHS social worker was Celeste Prouxl.  Terri Yetter worked as the MDHS licensure specialist who conducted the Faulkners' home study.

¶5.     In July 2004, the Faulkners formally adopted Andrew.  In 2009, Ricky was convicted of seven felonies regarding the molestation of Andrew and other children in the Faulkners'

2

home.

¶6.    On December 15, 2015, Andrew filed a complaint in the Hancock County Circuit Court against MDHS, the Hancock County Department of Human Services, Celeste, and Melissa.  In his complaint, Andrew asserted a negligence claim against MDHS and the Hancock County Department of Human Services under the Mississippi Tort Claims Act (MTCA), Mississippi Code Annotated sections 11-46-1 to -23 (Rev. 2019), and he asserted a cause of action against Celeste and Melissa for deprivation of constitutional rights under 42 U.S.C. § 1983.

¶7.    MDHS removed the case to the United States District Court for the Southern District of Mississippi.  Andrew then amended his complaint to assert that following his adoption by the Faulkners, Terri failed to report allegations of Ricky's abuse to MDHS and the youth court.  Andrew argued that Terri's failure to make such mandatory reporting was the proximate cause of Ricky's continued molestation of Andrew following the allegations made against Ricky.  Andrew also claimed that Terri and MDHS neglected their duties to conduct regular twice-monthly visits with Andrew[1] and regular monthly visits to the Faulkners' home.

¶8.    The federal court entered opinions and orders dismissing the claims against Celeste

---

[1] Andrew appears to have been relying on the requirements of the MDHS policy manual that was in effect after Ricky was arrested and Andrew was removed from the home. *See, e.g.*, Miss. Admin. Code § 18-6.D-VII (2015).  As explained later, the policy requirements during the relevant time period required weekly visits during the child's first month of foster care and "monthly face-to-face" visits thereafter. *See, e.g.*, Miss. Admin. Code § 18-6-1:D (2010).

and Terri. After ultimately disposing of all federal claims, the federal court sua sponte remanded the case to the Hancock County Circuit Court.

¶9. Following remand, MDHS moved for summary judgment. MDHS argued that based upon the plain language of Mississippi Code Annotated section 43-15-125 (Rev. 2015), MDHS is entitled to immunity from Andrew's claims regarding the investigation and licensing of the Faulkners' home, thereby entitling MDHS to summary judgment. MDHS also argued that the record is devoid of evidence to support Andrew's allegations that MDHS knew or should have known that Ricky was a pedophile before Andrew's placement with the Faulkners and also that MDHS knew or should have known that Andrew was being molested by Ricky and failed to take the appropriate measures in response. MDHS maintained that it did not have actual or constructive notice that Ricky was a pedophile prior to or throughout the duration of Andrew's foster-care placement with the Faulkners, nor did MDHS have actual or constructive notice of any abuse by Ricky prior to Andrew's adoption by the Faulkners. Finally, MDHS argued that MDHS's alleged failure to conduct regular visits with Andrew does not alone establish a claim for negligence. Specifically, MDHS asserted that Andrew could not establish that any negligence on the part of MDHS was the cause in fact of abuse he suffered by Ricky or that the abuse was foreseeable to MDHS.

¶10. In support of its motion for summary judgment, MDHS attached the following exhibits: Andrew's amended complaint; the federal court memorandum opinions and orders granting the motions filed by certain defendants; excerpts from Ricky's criminal trial

4

transcript; Andrew's deposition; the affidavits of Celeste and Terri; and the affidavit of Theresa Seeger, another foster parent. In her affidavit, Theresa asserted that she contacted Terri in 2005, a year after the Faulkners adopted Andrew, and alleged that two female children placed in her home had potentially been abused by Ricky while they were in the Faulkners' home. Theresa did not mention Andrew in her affidavit.

¶11. The circuit court heard arguments on the summary judgment motion on April 15, 2021. After the hearing, Andrew and MDHS submitted additional briefing.

¶12. On June 24, 2021, the circuit court entered its order granting summary judgment in favor of MDHS. The circuit court found that MDHS was entitled to judgment as a matter of law because Andrew could not establish any genuine issue of material fact as to his claims against MDHS. The circuit court also entered an order confirming that the judgment was a final judgment under Mississippi Rule of Civil Procedure 54(b).

¶13. Andrew appealed from the circuit court's order granting summary judgment.

## STANDARD OF REVIEW

¶14. The Mississippi Supreme Court has stated that a circuit court should grant a motion for summary judgment "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Darling Ingredients Inc. v. Moore*, 337 So. 3d 214, 216 (¶7) (Miss. 2022) (quoting M.R.C.P. 56(c)). The circuit court must view the evidence "in the light most favorable to the party

5

opposing the motion." *Id*.

¶15.  On appeal, we employ a de novo review of the circuit court's grant of a motion for summary judgment. *Calhoun v. Miss. Transp. Comm'n*, 314 So. 3d 181, 184 (¶15) (Miss. Ct. App. 2021). In so doing, we view the evidence "in the light most favorable to the party opposing the motion." *Id*. (quoting *Est. of Hudson v. Yazoo City*, 246 So. 3d 872, 876 (¶29) (Miss. 2018)). "Only if there is no genuine issue of material fact is the moving party entitled to summary judgment as a matter of law." *Id*. "Questions of law, which include proper application of the MTCA, also are reviewed de novo." *Id*.

## DISCUSSION

¶16.  Andrew argues that the circuit court erred in finding that he failed to establish the existence of a genuine issue of material fact as to his negligence claims against MDHS, including the claim relating to licensing the Faulkners' home.

¶17.  To survive summary judgment on his negligence claims, Andrew "bears the burden of producing evidence sufficient to establish the existence of the conventional tort elements of duty, breach, causation, and damages." *Spann v. Shuqualak Lumber Co.*, 990 So. 2d 186, 189 (¶7) (Miss. 2008). In his amended complaint, Andrew claimed MDHS was negligent in (1) licensing the Faulkners' home for foster placement and (2) breaching duties of care, thereby causing ongoing damages.

¶18.  Specifically, Andrew alleged that MDHS possessed the following duties: "a duty to fully and diligently investigate and screen" the Faulkners' home prior to Andrew's

6

placement; "a duty to conduct regular supervision and investigation" of the Faulkners' home "to determine and ensure the safety" of the home; and "a duty to fully and diligently supervise and inspect" the Faulkners' home after Andrew's placement.

¶19. Andrew claimed that MDHS breached its duties in the following instances: by failing to fully and diligently investigate and screen the Faulkners' home prior to Andrew's placement; by failing to conduct regular supervision and investigation of the Faulkners' home to determine and ensure Andrew's safety; by failing to fully and diligently supervise and inspect the Faulkners' home after Andrew's placement; by advocating for the adoption of Andrew by the Faulkners to the detriment of adoption by Andrew's relatives by disregarding the preferred policy of relative adoption; and by failing to report any suspicion of child abuse as required by Mississippi Code Annotated section 43-21-353 (Rev. 2015).

¶20. Finally, Andrew asserted that "[a]s a direct and proximate cause of [MDHS's] breaches," he suffered mental, physical, and economic damages that are ongoing.

## I. Licensing Immunity Under Section 43-15-125

¶21. In the order granting summary judgment, the circuit court found that pursuant to Mississippi Code Annotated section 43-15-125, MDHS is entitled to immunity from Andrew's claim that it was negligent in the licensing of the Faulkners' home. Section 43-15-125 provides that "[t]he Department of Human Services and/or its officers, employees, attorneys and representatives shall not be held civilly liable for any findings, recommendations or actions taken pursuant to this article." The Mississippi Supreme Court

has clarified that this immunity "extends to [M]DHS's inspections and investigations of the foster home for the purposes of licensing the home (and thereby the foster parent)." *Miss. Dep't of Hum. Servs. v. D.C. ex rel. Morin*, 289 So. 3d 712, 718 (¶23) (Miss. 2019).

¶22. In *D.C.*, a minor foster child was sexually abused by his foster parent. *Id*. at 714 (¶1). The child, D.C., brought a negligence suit against MDHS, the executive director of MDHS, and his foster parent, alleging negligence and gross negligence on behalf of MDHS and the executive director in the licensing of the foster home and in the lack of care and treatment given to D.C. during his placement and after he was removed from the foster home. *Id*. On appeal, the supreme court found that D.C.'s claims relating to MDHS's licensing of the foster home at issue failed as a matter of law under section 43-15-125. *Id*. at 718 (¶23). The supreme court explained that "[i]t is clear that the Legislature intended to shield [M]DHS and its officers from civil liability 'for any findings, recommendations or actions taken pursuant to this article.'" *Id*. (quoting Miss. Code Ann. § 43-15-125).

¶23. On appeal, Andrew makes no specific argument regarding the circuit court's grant of summary judgment as to any of his claims that were subject to the licensing immunity under section 43-15-125. Nevertheless, we agree with the circuit court that MDHS is entitled to immunity from Andrew's allegations regarding the investigation and licensing of the Faulkners' home. Therefore, no genuine issue of material fact remains for trial. We accordingly affirm the circuit court's decision that MDHS is entitled to summary judgment as a matter of law on the negligence claim relating to licensing.

## II. Other Negligence Claims

¶24. The circuit court next found that MDHS was entitled to summary judgment on Andrew's other negligence claims. The circuit court's finding that no genuine issue of material fact existed as to Andrew's negligence claims hinged on the element of causation. The circuit court held that Andrew failed to provide sufficient evidence on the element of causation necessary to overcome summary judgment.

¶25. In its order, the circuit court acknowledged Andrew's claim that MDHS breached at least one duty by failing to make regular visits with Andrew and to the Faulkners' home, but the circuit court held that "any such deficiency does not alone establish a claim for negligence." The circuit court reiterated that "recovery in a negligence action requires proof by a preponderance of the evidence of the conventional tort elements: duty, breach of duty and, [sic] proximate causation." The circuit court explained that Andrew failed to produce any proof that MDHS had actual or constructive knowledge or notice that Ricky was a pedophile prior to or at the time of Andrew's placement in the Faulkners' home or that there was something in Ricky's background that MDHS should have discovered. The circuit court stated that "it is undisputed that [Andrew] never reported that he was being molested by [Ricky] to anyone at all, much less to anyone with MDHS." Accordingly, the circuit court held that it is "undisputed that MDHS did not have actual notice/knowledge of any abuse by [Ricky] throughout [Andrew's] placement in the Faulkner home prior to his adoption by the Faulkners."

9

¶26. The circuit court further found that Andrew failed to present sufficient evidence to create a question of fact as to whether MDHS possessed constructive knowledge that Ricky was abusing Andrew. In support of his negligence claims, Andrew submitted factual allegations from before and after the Faulkners adopted Andrew. The circuit court held that "MDHS's ongoing duty to supervise [Andrew's] living situation throughout his foster care placement terminated with [his] formal adoption by the Faulkners." Additionally, the circuit court determined that "the nature of the allegations of [Theresa's] [a]ffidavit are too remote" from Ricky's molestation of Andrew "to give rise to for[e]seeability."

¶27. The circuit court ultimately determined that Andrew "cannot establish that had MDHS not failed to act, it would have been able to prevent the molestation" by Ricky. The circuit court also held that Andrew "cannot establish that the molestation by [Ricky] was foreseeable to MDHS, as demonstrated herein[,]" explaining that "[h]indsight speculation and conjecture are not enough to defeat summary judgment."

¶28. On appeal, Andrew asserts that causation is a question of fact, not a question of law, and therefore needs to be determined by a jury. This Court has held that "causation is generally a matter for the jury." *Knox v. Mahalitc*, 105 So. 3d 327, 330 (¶12) (Miss. Ct. App. 2011). We have clarified, however, that "a plaintiff must still produce a genuine issue of material fact regarding causation in order to reach a jury." *Id*. We recognize that the supreme court has "affirmed a grant of summary judgment upon finding that the plaintiff could not prove causation." *Id*.

10

¶29. Andrew asserts that the circuit court erred in finding no causal relationship between Terri's failure to report Theresa's allegation that Ricky was physically abusing his foster children and Ricky's continued sexual abuse of Andrew. Andrew also argues that the circuit court erred in finding that MDHS's failure to conduct its required visits with Andrew was not a proximate cause or contributing proximate cause of Andrew's injuries. The supreme court has explained that "[f]or a particular damage to be recoverable in a negligence action, the plaintiff must show that the damage was proximately caused by the negligence." *Glover ex rel. Glover v. Jackson State Univ.*, 968 So. 2d 1267, 1277 (¶31) (Miss. 2007). "In order for an act of negligence to proximately cause the damage, the fact finder must find that the negligence was both the cause in fact and legal cause of the damage." *Id*. (citing Dobbs, *The Law of Torts* § 180, at 443 (2000)).

¶30. A defendant's negligence is the cause in fact of a plaintiff's damage when "the act or omission was a substantial factor in bringing about the injury, and without it the harm would not have occurred." *Davis v. Christian Brotherhood Homes of Jackson, Miss. Inc*., 957 So. 2d 390, 404 (¶32) (Miss. Ct. App. 2007). "A defendant's negligence which is found to be the cause in fact of a plaintiff's damage will also be the legal cause of that damage, provided the damage is the type, or within the classification, of damage the negligent actor should reasonably expect (or foresee) to result from the negligent act." *Glover*, 968 So. 2d at 1277 (¶33). "Foreseeability means that a person of ordinary intelligence should have anticipated the dangers that his negligent act created for others." *Davis*, 957 So. 2d at 404 (¶32).

11

¶31. MDHS, as the summary judgment movant, "bears the burden of persuading the [circuit] judge that: (1) no genuine issue of material fact exists, and (2) on the basis of the facts established, [MDHS] is entitled to judgment as a matter of law." *Karpinsky v. Am. Nat'l Ins. Co.*, 109 So. 3d 84, 88 (¶11) (Miss. 2013) (emphasis omitted). After MDHS met its initial burden, Andrew, "the party who would bear the burden of proof at trial, had to produce evidence showing that a genuine issue of material fact existed with regard to [his] negligence claim[s]." *Darling Ingredients*, 337 So. 3d at 216 (¶8).

¶32. In its motion for summary judgment, MDHS submitted the following evidence to show that no genuine issue of material fact existed: Andrew's amended complaint; the federal court memorandum opinions and orders granting the motions filed by the defendants; excerpts from Ricky's criminal trial transcript; Andrew's deposition from August 2020; affidavits of MDHS employees Terri and Celeste; and the affidavit of foster parent Theresa Seeger. Andrew filed a response in opposition and submitted the following evidence to show that a genuine issue of material fact existed as to his negligence claims: excerpts of the trial transcript from Ricky's criminal trial; MDHS case-narrative records from Celeste and Terri; Andrew's deposition from August 2020; affidavits from Celeste, Terri, and Theresa; and the MDHS investigation report prepared by Dian Velasquez-McKaig. We now examine this evidence to determine whether Andrew met his burden of "producing evidence sufficient to establish the existence of the conventional tort elements of duty, breach, causation, and damages." *Spann*, 990 So. 2d at 189 (¶7).

12

¶33. The trial transcript shows that Andrew testified at Ricky's criminal trial and recounted the sexual abuse he suffered. Andrew testified that while he lived with the Faulkners, Ricky repeatedly molested him. Andrew testified, however, that he did not disclose the abuse to anyone:

| [Counsel for the State]: | At some point while you lived [with the Faulkners], were you ever asked if you had been abused? |
|---|---|
| [Andrew]: | Yes, ma'am. |
| [Counsel for the State]: | Okay. You were asked. And did you tell that you had been abused? |
| [Andrew]: | No, ma'am. |

When asked why he did not report the abuse, Andrew responded, "Because I was scared when I was living with him." Andrew testified that Ricky had told him not to tell anyone about the abuse.

¶34. During cross-examination, Andrew testified that he would have visits with his social worker, Celeste, at his school and at the MDHS office. Andrew testified that the Faulkners were not present during these visits. Andrew admitted that he could have reported the abuse to Celeste during these visits, but he did not. Andrew also admitted that he told MDHS that he wanted to be adopted by the Faulkners. After another foster child reported to MDHS that he was abused by Ricky, Andrew and other children were removed from the Faulkners' home. Andrew testified that after he was removed from the Faulkners' home, MDHS asked Andrew if Ricky had sexually abused him, and he initially denied being abused. However,

13

Andrew eventually reported the abuse to MDHS.

¶35. The transcript from Andrew's August 2020 deposition also reflects that Andrew did not ever report Ricky's repeated abuse to any social workers. Andrew testified that the first time he reported the abuse to anyone was after he was removed from the Faulkners' home in 2007. Andrew admitted that he could have told MDHS that he did not want to be adopted by the Faulkners, but he did not; instead, Andrew told MDHS that he agreed to the adoption. Andrew testified that Ricky had told Andrew that if he reported the abuse, Ricky would go to jail, and Andrew would get in trouble. Andrew testified that Celeste was friends with the Faulkners, and he alleged that she knew about the abuse and was trying to cover it up so that the Faulkners would not get in trouble.

¶36. The MDHS case-narrative records from Celeste contain notes from her visits, phone calls, and meetings with Andrew, as well as with his biological family and the Faulkners, from 2001 to 2004. Celeste's notes reflect that Andrew was happy and well cared for by the Faulkners. As stated, Celeste's affidavit and the documentation regarding her visits with Andrew and the Faulkners show that she did not consistently conduct the requisite monthly visits.

¶37. In her affidavit, Celeste stated that she supervised Andrew from 2001 to 2003. During that time, she visited and interacted with Andrew and the Faulkners on numerous occasions and in various settings, including the Faulkners' home, Andrew's school, and the county MDHS office. Celeste stated that at no time during her regular visits with Andrew did he

14

indicate or give her any reason to believe that Ricky was engaging in inappropriate conduct with him in the foster home. Celeste's case notes reflect that during the time she supervised Andrew while he was in the Faulkners' care, "he seemed happy and appeared to be healthy." Celeste further stated that at no time while she was supervising Andrew did anyone report any misconduct by Ricky, nor did she have any facts or information that would lead her to believe Ricky was engaging in inappropriate conduct with Andrew.

¶38. Similarly, Terri's MDHS case-narrative records documented approximately thirty-one visits with the Faulkners and Andrew from 2001 to 2005, which total less than the monthly visits required by the MDHS policy manual. The records show that some of the visits to the Faulkners' home were unannounced. Terri recorded that the Faulkners' home was always clean and that the children appeared happy. In one of her notes, Terri opined that "[t]he Faulkners have been wonderful foster parents, always taking such good care of the children." Another note reflects that "[t]he Faulkners are both very loving and nurturing foster parents."

¶39. Terri's affidavit reveals that she conducted a home study of the Faulkners' home. This study entailed obtaining and documenting information about the Faulkners that included the following: their personal histories, marriage, employment, community life, sexual issues, motivation for adoption, religion, views concerning discipline, health, clearances (criminal background checks including National Crime Information Center, sheriff's department, and the Central Child Abuse Registry), extended family support systems, directions to the family home, a description of the home, a description of the neighborhood finances, and their

understanding of agency policy. Terri also conducted five separate personal interviews with Ricky and Melissa. Terri specified that she interviewed them separately and together. Additionally, Terri obtained personal references for the Faulkners, and she confirmed that all the references stated that they recommended Ricky and Melissa as foster parents.

¶40. Terri further stated in her affidavit that while Andrew was in foster case, she had no knowledge or any objectively reasonable belief that Ricky was engaging in any inappropriate behavior, including sexual abuse, toward Andrew, and at no time did anyone report any misconduct by Ricky. Terri also stated that at no time during her regular visits with Andrew did he indicate to her or give her any reason to believe that Ricky was engaging in inappropriate conduct with him.

¶41. Theresa's affidavit reflects that she was a licensed foster parent who accepted the placement of two minor female children in her home in August 2005. Theresa stated that at the time, the children were approximately four years old and five years old. Prior to their placement in Theresa's home, the two minor female children were placed with the Faulkners. Theresa stated that when they arrived at her home, the children were malnourished, and one child was infested with lice.

¶42. According to Theresa's affidavit, shortly after being placed in her home, the two minor female children reported to her that the Faulkners physically abused them by putting the children in the attic when they are "bad" or making them kneel on rice. Theresa stated that she then contacted Terri to report suspected abuse by the Faulkners. The affidavit

16

reflects that in response, Terri informed Theresa that kids will sometimes "say things" and that the Faulkners were a "fine Christian family." Shortly after, Theresa observed one of the children masturbating. Theresa again contacted Terri. Theresa stated that Terri again disregarded her concerns. Theresa stated that at that point, she stopped calling MDHS because "it had become apparent to [her] that no one was going to investigate."

¶43. Theresa did not mention Andrew in her affidavit. Additionally, the record reflects that when Theresa reported her suspicions to Terri in August 2005, Andrew had been out of MDHS custody for more than a year.

¶44. MDHS employee Dian Velasquez-McKaig prepared an investigation report on March 20, 2007. The report reflects that one of the Faulkners' other foster children alleged that Ricky had sexually abused him. This child also informed MDHS that Ricky had sexually abused Andrew. The report shows that this other foster child initially reported the abuse to his biological mother, who then reported it to MDHS. MDHS conducted an investigation into the alleged abuse and interviewed Ricky and Melissa, the child, Teresa Seeger, and other foster children who had been in the Faulkners' care. This particular report did not reflect any interview with Andrew, although the record shows that Dian did interview Andrew regarding Ricky's abuse.

¶45. We first address Andrew's argument that the circuit court erred in finding no causal relationship between Terri's failure to report Theresa's allegation that Ricky was physically abusing his foster children and Ricky's continued sexual abuse of Andrew. Andrew claims

17

that if Terri had reported Theresa's allegation, MDHS would have conducted an investigation, and the abuse would have been discovered earlier. Andrew states that as a social worker, Terri is required by law to report abuse, regardless of whether Andrew was in the custody of MDHS.

¶46. Section 43-21-353(1) states:

> Any . . . social worker, family protection worker, family protection specialist, . . . or any other person having reasonable cause to suspect that a child is . . . an abused child . . . shall cause an oral report to be made immediately by telephone or otherwise and followed as soon thereafter as possible by a report in writing to the Department of Child Protection Services, and immediately a referral shall be made by the Department of Child Protection Services to the youth court intake unit, which unit shall promptly comply with [s]ection 43-21-357.

Miss. Code Ann. § 43-21-353(1). Terri, in her capacity as a licensure specialist for MDHS, had a duty under the law and MDHS policy to make a formal report of Theresa's suspicions of abuse, and MDHS had a duty to refer the report to the youth court intake unit and investigate Theresa's allegations. A jury could find that if these steps had been taken, MDHS would have substantiated the girls' reports of abuse, which the evidence indicates were truthful. Moreover, "a court may find that if one child is abused, the child's siblings are neglected. The basis is that a sibling has been harmed, and the potential harm to the other child is sufficient to warrant both children being removed from the harmful environment." *Bullock v. Miss. Dep't of Child Prot. Servs.*, 343 So. 3d 1079, 1087-88 (¶29) (Miss. Ct. App. 2022) (quoting *T.T. v. Harrison Cnty. Dep't of Hum. Servs.*, 90 So. 3d 1283, 1287 (¶19) (Miss. Ct. App. 2012) (quoting *S.C. v. State*, 795 So. 2d 526, 532 (¶27) (Miss. 2001))).

18

Therefore, the evidence also supports a reasonable inference that Andrew would have been removed from the home if Terri had properly reported and investigated Theresa's allegations. Had she done so, she could have prevented at least some of the abuse that Andrew suffered at the hands of Ricky.

¶47.	In granting summary judgment, the circuit court determined that "the nature of the allegations of [Theresa's] [a]ffidavit are too remote" from Ricky's molestation of Andrew "to give rise to foreseeability." We recognize that a plaintiff must show that the defendant's negligence proximately caused his damages, which means "that the defendant's negligence must not only be the cause in fact of [the plaintiff's] injuries and damages, but also the legal cause, that is, the damages must also have been a reasonably foreseeable consequence of the defendant's negligence." *Glover*, 968 So. 2d at 1277 (¶34). But "in satisfying the requirement of foreseeability, a plaintiff is not required to prove that the exact injury sustained by the plaintiff was foreseeable; rather, it is enough to show that the plaintiff's injuries and damages fall within a particular kind or class of injury or harm which reasonably could be expected to flow from the defendant's negligence." *Id*. at 1278 (¶37).

¶48.	In the present case, we find that it was "reasonably foreseeable" that a failure to report allegations of abuse against two children would result in the continued abuse of another child still living in the home in which the alleged abuse occurred. Theresa's concerns regarding the age-inappropriate sexual behavior of one girl at least suggested possible sexual abuse, and it is unclear whether the girls ever experienced any sexual abuse. Andrew merely

19

testified that he was not "aware of" any sexual abuse of the girls and that he "didn't witness it." More important, though, as the supreme court held in *Glover*, Andrew "is not required to prove" that Terri could have foreseen that her failure to act would bring about "the *exact* injury [he] sustained." *Id*. (emphasis added). Rather, it is sufficient for Andrew to show that it was foreseeable that children still in the house would continue to be abused in some manner—his continued abuse is within the "kind or class of injury or harm which reasonably could be expected to flow from the [failure to report]." *Id*. In addition, our supreme court has recognized that the "foreseeability" component of "causation is generally a matter for the jury." *Ready v. RWI Transp. LLC*, 203 So. 3d 590, 594 (¶9) (Miss. 2016); *see also Foradori v. Harris*, 523 F.3d 477, 496 (5th Cir. 2008) ("Whether a cause of injury is foreseeable is a question for the jury."). After our review, we find that Andrew presented sufficient evidence to create a jury question as to whether Terri's failure to report allegations of abuse was a cause in fact and legal cause of his continued sexual abuse. The circuit court therefore erred in granting summary judgment in favor of MDHS as to this issue.

¶49. Andrew also argues that the record shows that MDHS failed to maintain the required contact with him while he was in MDHS custody, and this failure is the cause in fact of his injuries. The record shows that both Andrew and MDHS agree that MDHS owes ministerial duties to children in its care, as articulated in *Mississippi Department of Human Services v. S.W.* (*S.W. I*), 974 So. 2d 253 (Miss Ct. App. 2007). In *S.W. I*, this Court stated that "[M]DHS is required by statute 'to administer or supervise all public children welfare

20

services,' and to 'provide for the care of depend[e]nt and neglected children in foster family homes or in institutions[.]'" *Id*. at 259 (¶12) (citing Miss. Code Ann. § 43-15-5 (Rev. 2004)). This Court explained that "[in order] [t]o carry out these duties, [M]DHS has developed formal guidelines and procedures for the provision of social services in the areas of personal protection, prevention of abuse and neglect, and placement of children in out-of-home settings." *Id*. This Court noted that "[t]his operating procedure is outlined in detail in . . . [M]DHS's policy manual." *Id*.

¶50.    Andrew asserts that his social worker was required to meet with him at least twice a month, quoting from the current MDHS policy manual. *See, e.g.*, Miss. Admin. Code § 18-6.D-VII (2015) (providing that the assigned MDHS worker "shall meet with the child in person and, where age-appropriate, alone at least twice monthly to assess the child's safety and well-being, service delivery, and achievement of permanency and other service goals"). The MDHS's policy manual during the relevant time period, however, requires that when a child is in foster care, *weekly* contact with the foster child during the first month of placement is required, and continuous "*monthly face to face*" visits with the child after the first month. *See, e.g.*, Miss. Admin. Code § 18-6-1:D (2010) (emphasis added); *see S.W. I*, 974 So. 2d at 259 (¶14). The record reflects that DHS failed to even meet these requirements.

¶51.    This Court has held that "[a]lthough the manner in which to execute the [required] contacts involves an element of choice, [M]DHS employees are not at liberty to choose whether or not to adhere to the minimum contact requirements." *S. W. I*, 974 So. 2d at 259

21

(¶15). As stated, our review of the record shows that although Terri and Celeste did conduct visits with Andrew and to the Faulkners' home, these visits did not adhere to the minimum contact requirements. Indeed, MDHS does not dispute that it is bound by its policy requirements, arguing instead that even if it failed to meet them, "any such breach does not alone establish a claim for negligence." Likewise, the circuit court acknowledged Andrew's claim that MDHS breached its duty by failing to make regular visits with Andrew and to the Faulkners' home, but the court found that "any such deficiency does not alone establish a claim for negligence."

¶52.    In *S.W. II*, this Court held that the failure to maintain the required contact with a child in MDHS custody "caused [the child] to suffer" repeated sexual abuse. *Miss. Dep't of Hum. Servs. v. S.W. (S.W. II)*, 111 So. 3d 630, 646-47 (¶34) (Miss. Ct. App. 2012). The plaintiff, S.W., filed a complaint against MDHS seeking damages he suffered as a result of MDHS's negligence while he was placed in the legal custody of MDHS as a minor. *S.W. I*, 974 So. 2d at 256 (¶1). S.W. specifically alleged that MDHS "breached its statutory duties to him while he was in its care and custody, allowing him to be sexually abused by employees of the child care facilities in which he was placed." *Id*. After a trial, the circuit court found that MDHS "breached its duty to protect and care for S.W. in three respects[,]" one of which was because MDHS "failed to make required monthly face-to-face contacts with S.W." *Id*. at 257 (¶7). MDHS appealed, arguing that "the alleged negligent conduct was discretionary in nature and, therefore, immune from suit under [the MTCA]." *Id*. at 258 (¶9).

22

¶53. On appeal, this Court affirmed the circuit court's finding of liability based upon MDHS's breach of its ministerial, nondiscretionary governmental duties. *Id*. at 264 (¶36). This Court explained that when a foster child like S.W. is placed in a licensed childcare facility, the MDHS Administrative Manual requires "monthly contact with the child (weekly contact the first month of placement). Contacts may be made face-to-face, by telephone calls, or written correspondence. (Face-to-face contact must be at least quarterly)." *Id*. at 259 (¶14). This Court held that "[a]lthough the manner in which to execute the monthly contacts involves an element of choice, [M]DHS employees are not at liberty to choose whether or not to adhere to the minimum contact requirements." *Id*. at (¶15). "[M]DHS employees *have no discretion to make less than the required contact*." *Id*. (emphasis added). This Court accordingly held that MDHS's "duty to contact S.W. in accordance with the minimum mandatory directives of [M]DHS regulations is ministerial in nature" and therefore not subject to the discretionary function exemption of the MTCA. *Id*. However, this Court reversed and remanded the case for a new trial on damages. *Id*.

¶54. On remand, the parties agreed to submit the issues of damages to the circuit court for a decision based upon the record already before the court. *S.W. II*, 111 So. 3d at 634 (¶6). The parties submitted proposed findings of fact and conclusions of law to the circuit judge, and the circuit court issued an opinion and order finding, in part, that although MDHS "was obligated to have quarterly face-to-face visits with [S.W.], . . . [M]DHS made only one visit, instead of the three required visits [during the specified time period]." *Id*. at 635 (¶6). The

circuit court held that S.W. was entitled to damages "[f]or each visit [M]DHS failed to initiate[.]" *Id.* MDHS appealed the circuit court's award of damages to S.W. *Id.* at 631 (¶3).

¶55. In *S.W. II,* this Court explained that "[w]hen the State places a child in a state-regulated foster care, the State has entered into a special relationship with that child that imposes certain affirmative duties to be performed by the government custodian, as shown in the governing statutes, regulations, and policies of [M]DHS." *Id.* at 640 (¶21). Upon review, this Court found that "[t]he record supports the circuit court's findings that [M]DHS failed to conduct two of its three mandatory quarterly visits between October 1996 and June 1997, and that [M]DHS missed six monthly visits between June 1997 and December 1997 and failed to interview or provide counseling for S.W." *Id.* This Court accordingly determined that "[t]he record reflects substantial support for the circuit court's findings of negligence by [M]DHS, and therefore the question before the circuit judge was whether the separate concurrent or successive negligent acts, or negligent omissions of its duty to act, by [M]DHS constituted a substantial factor in bringing about the harm to S.W." *Id.* at (¶22) (citing *Glover*, 968 So. 2d at 1277 n.11; *Entrican v. Ming*, 962 So. 2d 28, 36 (¶24) (Miss. 2007)).

¶56. This Court stated that "to be liable under negligence law, a particular defendant's negligence need not be the sole cause of the injury suffered if his negligence concurring with one or more efficient causes proximately causes the plaintiff's harm." *Id.* at 640 (¶22) (citing *Entrican*, 962 So. 2d at 32 (¶12)). This Court then explained that "[t]he affirmative duties

24

of [M]DHS to protect and care for children placed in its custody and the nondiscretionary duties imposed by [M]DHS's own policies and regulations provide evidence of duty and foreseeability." *Id*. Notably, this Court recognized that "[p]recedent establishes that the fact that [M]DHS failed to foresee the extent of harm or the manner of harm does not prevent liability for its negligence." *Id*. (citing *Rein v. Benchmark Constr. Co.*, 865 So. 2d 1134, 1143-45 (¶29-34) (Miss. 2004); *Doe ex rel. Doe v. Wright Sec. Servs. Inc.*, 950 So. 2d 1076, 1079 (¶12) (Miss. Ct. App. 2007)). After its review, this Court ultimately held that the record supported the circuit court's award of damages to S.W., explaining that "[a]s previously noted, the record clearly shows that S.W. endured repeated sexual abuse *as a result of the lack of supervision, protection, and appropriate care by* [*M*]*DHS*." *Id*. at 646-47 (¶34) (emphasis added).

¶57.    In *D.C.*, the supreme court recognized this Court's holding in *S.W. I*, explaining that "allegations of the lack of care and treatment of foster children have been recognized as actionable under the MTCA." *D.C.*, 289 So. 3d at 719 (¶31). In his negligence claim against MDHS, D.C. alleged that MDHS "did not meet its burden of production concerning D.C.'s claim that it did not care for him during his placement." *Id*. at 720 (¶33). MDHS moved for summary judgment, which the circuit court denied. *Id*. Upon review, the supreme court found that MDHS "did not introduce any evidence that it complied with its policies regarding its care of D.C. during his placement" with his foster parent. *Id*. The supreme court accordingly affirmed the circuit court's denial of summary judgment as to this issue after

25

finding "[t]here is no evidence in the record that [M]DHS followed its policies and regulations regarding DHS's care and treatment of D.C. during placement[,] . . ." and therefore MDHS "did not meet its burden to show that no genuine issue as to any material fact existed." *Id*. at 721 (¶¶36-37).

¶58. In the case before us, the circuit court acknowledged Andrew's claim that MDHS breached its duty by failing to make regular visits with Andrew and to the Faulkners' home. As stated above, our review of the record confirms that MDHS did not adhere to the minimum contact requirements when conducting visits with Andrew. The circuit court found that "any such deficiency does not alone establish a claim for negligence," and the circuit court ultimately held that Andrew failed to provide proof of the element of causation. However, as stated, this Court has expressed that "[t]he affirmative duties of [M]DHS to protect and care for children placed in its custody and the nondiscretionary duties imposed by [M]DHS's own policies and regulations provide evidence of duty and foreseeability." *S.W. II*, 111 So. 3d at 640 (¶22). "[T]he fact that [M]DHS failed to foresee the extent of harm or the manner of harm does not prevent liability for its negligence." *Id*.

¶59. After our review, we find that the circuit court erred in granting summary judgment in favor of MDHS as to this issue. The record shows that Andrew produced sufficient evidence to meet his burden of showing that a genuine issue of material fact existed with regard to his negligence claims; namely, that MDHS's breach of its duty to conduct its required visits with Andrew was a proximate cause of Ricky's repeated sexual abuse of

Andrew. *See Darling Ingredients*, 337 So. 3d at 216 (¶8).

## CONCLUSION

¶60. We find that the circuit court was correct in granting summary judgment in favor of MDHS on Andrew's claim that MDHS was negligent in the licensing of the Faulkners' home. However, we find that Andrew met his burden of establishing the existence of a genuine issue of material fact as to (1) whether a causal relationship existed between Terri's failure to report Theresa's allegations of sexual abuse by Ricky and Ricky's continued sexual abuse of Andrew, and (2) whether MDHS's breach of its duty to conduct its required visits with Andrew was a proximate cause of the continual sexual abuse by Ricky. We therefore affirm the circuit court's judgment in part, and we reverse the judgment in part and remand the case for further proceedings consistent with this opinion.

¶61. **AFFIRMED IN PART; REVERSED AND REMANDED IN PART.**

**GREENLEE, WESTBROOKS, McDONALD, LAWRENCE, McCARTY, SMITH AND EMFINGER, JJ., CONCUR. BARNES, C.J., CONCURS IN PART AND DISSENTS IN PART WITHOUT SEPARATE WRITTEN OPINION. WILSON, P.J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION, JOINED BY BARNES, C.J.**

**WILSON, P.J., CONCURRING IN PART AND DISSENTING IN PART:**

¶62. I concur with the majority that MDHS has statutory immunity and is entitled to summary judgment with respect to any claim related to the licensing of the Faulkners' foster home. I also concur that Andrew presented sufficient evidence to survive summary judgment on his claim based on Terri Yetter's failure to report specific allegations that the Faulkners

27

had abused their other foster children. However, I would affirm the circuit court's grant of summary judgment on Andrew's claim based on MDHS's failure to maintain minimum face-to-face contacts with him while he was in foster care. The circuit court properly granted summary judgment on that claim because there is no evidence that MDHS's failure to adhere to agency policy was a cause in fact of Andrew's injuries. Therefore, I respectfully dissent from the reversal of summary judgment on that claim.

¶63. MDHS placed Andrew in the Faulkners' home sometime between August 2000 and June 2002. There are statements in the record that Andrew was placed with the Faulkners in 2000 or 2001. But MDHS's case narratives state that only two of Andrew's siblings were placed with the Faulkners in August 2000, and Andrew and another sibling were not placed there until June 2002. In July 2004, the Faulkners adopted Andrew, at which point he ceased to be in MDHS custody. As the majority states, the version of the MDHS policy manual in effect during the relevant time period required MDHS to maintain monthly face-to-face contact with Andrew while he was in foster care. Area Social Work Supervisor Celeste Proulx submitted an affidavit stating that she visited Andrew fourteen times between August 2001 and May 2003—nine times prior to June 2002 and five times after June 2002. MDHS records show that Terri and other workers had face-to-face contact with Andrew and his siblings approximately eighteen additional times between April 2003 and July 2004.[2] The

_____

[2] As the majority notes, Terri submitted an affidavit stating that she "documented thirty-one separate interactions with the Faulkners and the foster children in the home, including Andrew," between September 19, 2001, and October 28, 2005. However, these

28

MDHS records do not appear to document any interactions with Andrew prior to August 2001. Again, it is unclear whether Andrew was living with the Faulkners during that time. Prior to being placed with the Faulkners, Andrew lived with another foster family, but MDHS removed him from that home and placed him with the Faulkners so that he and his three siblings could all live together. It is not clear exactly when that occurred.

¶64. In summary, the record indicates that Andrew was in foster custody in the Faulkner home for as little as two years or as long as four years. During the approximately two-year period from June 2002 to July 2004, MDHS workers documented approximately twenty-three face-to-face contacts with Andrew—slightly less than monthly, but not much less. During the three-year period from August 2001 to July 2004, MDHS documented approximately thirty-two face-to-face contacts with Andrew—again, slightly less than monthly, but not much less. As stated, the record does not address the period from August 2000 to August 2001, and it is not clear that Andrew lived with the Faulkners during that time.

¶65. Regardless of precisely when Andrew was placed in the Faulkners' home, the record indicates that MDHS failed to make face-to-face contact with him in multiple months, which was contrary to the agency's policy. MDHS's failure to maintain minimum contacts with a child in foster care may support a claim for negligence under the MTCA. *See Miss. Dep't of Hum. Servs. v. D.C. ex rel. Morin*, 289 So. 3d 712, 719 (¶31) (Miss. 2019) (citing *Miss.*

_____

"interactions" appear to include Celeste's visits, other visits that occurred after Andrew was no longer in MDHS custody, and possibly phone conversations with Melissa.

29

*Dep't of Human Servs. v. S.W.* (*S.W. I*), 974 So. 2d 253, 259-60 (Miss. Ct. App. 2007)).

¶66.    But in order to survive summary judgment on this claim, Andrew must also present evidence sufficient to support a finding that MDHS's negligence was the cause in fact and legal cause of his injury. *Glover ex rel. Glover v. Jackson State Univ.*, 968 So. 2d 1267, 1277 (¶31) (Miss. 2007). A defendant's negligence is the cause in fact of a plaintiff's injury if "but for the defendant's negligence, the injury would not have occurred." *Id.* at (¶32) (footnote omitted). In order to survive summary judgment, a plaintiff "must 'introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a cause in fact of the result. A mere possibility of such causation is not enough.'" *Rowan v. Kia Motors Am. Inc.*, 16 So. 3d 62, 66 (¶12) (Miss. Ct. App. 2009) (quoting *Herrington v. Leaf River Forest Prods. Inc.*, 733 So. 2d 774, 777 (¶10) (Miss. 1999)). Likewise, "[t]he non-moving party at summary judgment cannot meet the element of causation with 'a mere guess, speculation, or conjecture,' as this 'is insufficient to create a genuine issue of material fact.'" *Calhoun v. Miss. Transp. Comm'n*, 314 So. 3d 181, 186 (¶22) (Miss. Ct. App. 2021) (quoting *Rogers v. Barlow Eddy Jenkins P.A.*, 22 So. 3d 1219, 1223 (¶14) (Miss. Ct. App. 2009)).

¶67.    Here, there is no evidence to suggest that Andrew would have disclosed Ricky's abuse to MDHS workers if they had complied with agency policy and made a handful of additional contacts with him. Despite numerous face-to-face contacts with MDHS workers, Andrew never disclosed that Ricky was sexually abusing him. Nor did he ever disclose the abuse to

30

anyone else. Andrew testified that he never told anyone because he was scared of Ricky. Indeed, even after another child finally disclosed Ricky's abuse, Andrew initially denied that Ricky had abused him. Moreover, it is an unfortunate fact that "sex crimes against children are furtive, secret events usually lacking evidence" in the absence of a disclosure by the victim. *McGrath v. State*, 271 So. 3d 437, 440 (¶12) (Miss. 2019) (quoting *Derouen v. State*, 994 So. 2d 748, 754 (¶17) (Miss. 2008)). Under these circumstances, it would be "a mere guess, speculation, or conjecture" to suggest that strict compliance with the agency's minimum-contacts policy would have somehow uncovered and prevented the abuse that Andrew suffered. *Calhoun*, 314 So. 3d at 186 (¶22) (quoting *Rogers*, 22 So. 3d at 1223 (¶14)). Accordingly, the circuit court properly granted summary judgment on Andrew's claim based on MDHS's noncompliance with its minimum-contacts policy.

¶68. In reversing the grant of summary judgment on this claim, the majority relies on *Mississippi Department of Human Services v. S.W.* (*S.W. II*), 111 So. 3d 630 (Miss. Ct. App. 2012), *cert. granted*, 102 So. 3d 272 (Miss. 2012), *and cert. dismissed*, No. 2010-CT-01036-SCT, 2012 WL 6721154 (Miss. Apr. 18, 2013). However, *S.W. II* produced no majority opinion and therefore has no precedential value.[3] In fact, only four judges joined the lead

---

[3] As our Supreme Court has held, "a majority of all sitting judges is required to create precedent, and therefore, it follows that a plurality vote does not create a binding result." *Buffington v. State*, 824 So. 2d 576, 580 (¶15) (Miss. 2002). The lead opinion in *S.W.* was not even a "plurality" opinion because fewer judges joined it than joined the dissent.

opinion in *S.W. II*, whereas five judges joined the dissent.[4]

¶69.    In *S.W. II*, the plaintiff (S.W.) was in MDHS custody from October 1996 to December 1997. *Id.* at 632-33 (¶4). Between October 1996 and June 1997, S.W. was placed in two different state facilities where he was sexually abused. *Id.* During that time, MDHS was required to make quarterly face-to-face contacts with S.W., but the trial judge found that MDHS made only one of three required contacts. *Id.* at 635 (¶6). The trial judge awarded $50,000 for each of the two missed visits. *Id.* In June 1997, S.W. was returned to his mother's physical custody, but he remained in MDHS's legal custody until December 1997. *Id.* at 633 (¶4). During that six-month period, MDHS was required to make monthly face-to-face contacts with S.W., but the trial judge found that MDHS made no such contacts. *Id.* The trial judge also awarded S.W. $50,000 for each of those six missed visits. *Id.* The trial judge awarded damages for those six missed visits even though, as the dissent pointed out, S.W. was in his mother's custody and experienced no further sexual abuse as a result of the missed visits. *Id.* at 655 (¶¶74-75) (Griffis, P.J., dissenting). The trial judge also awarded $50,000 for MDHS's failure to conduct an adequate investigation of alleged abuse and $50,000 for MDHS's failure to provide counseling to S.W. *Id.* at 645 (¶4).

¶70.    On appeal, the four-judge lead opinion concluded that the record supported the trial judge's award of $50,000 damages "for each separate breach." *Id.* at 645-47 (¶¶32-34).

---

[4] Judge Carlton wrote the lead opinion, which was joined by Judges Lee, Irving, and Russell. Judge Fair concurred in the result only without a separate written opinion. Judge Griffis wrote the dissent, which was joined by Judges Barnes, Ishee, Roberts, and Maxwell.

However, the four-judge lead opinion did not explain how the missed visits—including the six missed visits that occurred after the sexual abuse had ended—each proximately caused $50,000 in damages. In contrast, the five-judge dissent concluded that the trial judge failed to explain how the missed quarterly visits "proximately caused S.W. damages" given that S.W. failed to reveal sexual abuse when MDHS workers did make contact with him. *Id.* at 654-55 (¶72) (Griffis, P.J., dissenting). In addition, the dissent found no evidence to support an award of damages for the failure to conduct monthly visits from July 1997 to December 1997—after the sexual abuse had ended. *Id.* at 655-56 (¶¶74-77).

¶71. I have briefly discussed the facts, issues, and opinions in *S.W. II* only to make clear that it has no precedential value. In *S.W. II*, "this Court" did not hold anything; rather, two judges provided their opposing non-precedential views of the case, and the judgment of the trial court was affirmed by an evenly divided Court. Since *S.W. II* is not precedent, it would serve no purpose to discuss it further.

¶72. In this case, for the reasons discussed above, the circuit court correctly concluded that Andrew failed to come forward with evidence that MDHS's failure to comply with the agency's minimum-contacts policy was a cause in fact of his injuries. Therefore, I would affirm the circuit court's grant of summary judgment with respect to that claim, and I respectfully dissent in part.

**BARNES, C.J., JOINS THIS OPINION.**

33